IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

CARLA L. ROBINSON,

      Plaintiff,

V.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

      Defendant.

CIVIL ACTION NO. H-08-2085

**MEMORANDUM AND ORDER GRANTING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND DENYING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Before the Court in this social security appeal is Plaintiff's Motion for Summary Judgment

(Document No. 16), and Defendant's cross Motion for Summary Judgment (Document No.

After considering the cross motions for summary judgment, the administrative record, the written

decision of the Administrative Law Judge, and the applicable law, the Court ORDERS, for the

reasons set forth below, that Defendant's Motion for Summary Judgment is DENIED, that Plaintiff's

Motion for Summary judgment is GRANTED, and that this case is REMANDED to the

Commissioner for further proceedings.

**I. Introduction**

Plaintiff Carla L. Robinson ("Robinson") brings this action pursuant to section 205(g) of the

Social Security Act ("Act"), 42 U.S.C. § 405(g) seeking judicial review of an adverse final decision

of the Commissioner of the Social Security Administration ("Commissioner") denying

application for disability insurance benefits. Robinson argues that the Administrative Law Judge

("ALJ") decision is flawed because: (1) the ALJ applied an incorrect legal standard in rejecting

opinion of her treating physician; (2) the ALJ did not meet the substantial evidence standard in

determining that Robinson did not meet or medically equal an impairment in Listing 11.09; (3)

the ALJ failed to meet the substantial evidence standard in determining that Robinson's Residual

Functional Capacity ("RFC") was above sedentary and that Robinson could return to work. In

response, the Commissioner claims that the ALJ properly assessed and rejected the opinion of

Robinson's treating physician, that Robinson failed to show that her disability equaled an impairment

in Listing 11.09, and that the ALJ properly found that Robinson can perform light work.


## II. Administrative Proceedings

On May 12, 2005, Robinson filed her claim for disability insurance benefits, claiming that

she has been unable to work since January 31, 2005, due to complications from multiple sclerosis.

(Tr. 203).   The Social Security Administration denied her application at the initial and

reconsideration stages   (Tr. 34, 36).   After that, Robinson requested a hearing before an

Administrative Law Judge ("ALJ"). (Tr. 48). The request was granted and Robinson had a hearing

before ALJ Robert M. McPhail on March 12, 2007. (Tr. 206).

On July 27, 2007, the ALJ issued an opinion unfavorable to Robinson. (Tr. 26). The ALJ

used the five-step test found in 20 CFR 404.1520(a). (Tr. 19). He found that Robinson had not

engaged in substantial gainful activity since January 31, 2005 and that Robinson has multiple

sclerosis. (Tr. 20-21). The ALJ also found that Robinson does not have an impairment meeting or

medically equaling one of the listed impairments in 20 CCF 404.1520(d   Specifically, the
found that "laimant does not have disorganization of motor function in 2   tremities, as desc
at 11.04B," hat claimant "has neither visual impairments... nor mental im   irments," and tha
medical evidence in the file does not show significant, reproducible fatigu   of motor function
substantial muscle weakness, demonstrated on physical examination " (T 2 22).

In making these findings, the ALJ rejected assertions by Dr. Newmark, Robinson's pr
physician, the effect that claimant is disabled and cannot work.   he ALJ dismissed
Newmark' findings on the grounds that they were not supported by the medical evidence an
they were general principles which do not decide this particular case."   r. 3). Relying on
testimony other expert witnesses, the ALJ concluded that the claiman ean "perform all
exertional mands of light work" including lifting, standing, walking and s ting throughout a
work day with normal breaks, and that the claimant is capable of performing her past relevant
as a probation officer. (Tr. 22-25).

Robinson sought review of the ALJ's adverse decision with the Appeals Council.
Appeals Council will grant a request to review an ALJ's decision   any of the follow
circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made
error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's act
findings, conclusions; or (4) a broad policy issue may affect the public interest. 20 C.
404.970; 2 C.F.R. § 416.1470. The Appeals Council for the Social Security Administration
Robinson' request on May 2, 2008, making the decision of the ALJ the final decision
Commissioner of Social Security. (Tr. 4). Robinson has timely filed er appeal of the
decision. 2 U.S.C. § 405(g). Both Robinson and the Commissioner have filed Motio

Summary Judgment (Document Nos. 15 & 16). This appeal is now ripe for ruling.

The evidence is set forth in the transcript pages 1 through 237. (Document No. 11). There is no dispute as to the facts contained therein.

### III. Standard for Review of Agency Decision

The court's review of a denial of disability benefits is limited "to determining (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 92, 593 (5th Cir. 19). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision: "The finding of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." The Act specifically grants the district court the power to enter judgment, upon the pleadings and the transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing" when not supported by substantial evidence. 42 U.S.C. § 405(g). While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable. *Simmons v. Harris*, 602 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issue de novo, or substitute [its] judgment for that of the [Commissioner] even if the evidence preponderates against the [Commissioner's] decision." *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988) *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999); *Cook v. Heckler*, 750 F.2d 391 (5th Cir. 1985) Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act to

be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.*,

U.S. 197, 229 (1938). Substantial evidence is "more than a scintilla and less than a preponderance."

*Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than a

suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found

only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"

*Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

## IV. Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the

burden of proving his disability. *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988). The Act

defines disability as the "inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12 months." 42

U.S.C. § 423(d)(3). The impairment must be proven through medically accepted clinical and

laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). The impairment must be so severe as to

limit the claimant in the following manner:

> [She] is not only unable to do [her] previous work but cannot, considering [her] age,
> education, and work experience, engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of whether such work exists in the
> immediate area in which [she] lives, or whether a specific job vacancy exists for
> [her], or whether [she] would be hired if [she] applied to the work

5

42 U.S.C. § 423 (d)(2)(A). The mere presence of an impairment is not enough to establish that

is suffering from a disability. Rather, a claimant is disabled only if he is "incapable of engaging

any substantial gainful activity." *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting

*Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)).

> The Commissioner applies a five-step sequential process to decide disability status:
>
> 1.    the claimant is presently working, a finding of "not disabled" must be made;
>
> 2.    if the claimant does not have a "severe impairment" or combination of impairments, he will not be found disabled;
>
> 3.    if the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;
>
> 4.    if the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and
>
> 5.    if the claimant's impairment prevents him from doing any other substantial gainful activity, taking into consideration his age, education, past work experience and residual functional capacity, he will be found disabled.

*Anthony*, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v.*

*Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). Under this framework, the claimant bears the burden

of proof on the first four steps of the analysis to establish that a disability exists. If successful, the

burden shifts to the Commissioner, at step five, to show that the claimant can perform other work.

*McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). Once the Commissioner shows that other jobs

are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v. Sullivan*, 914

F.2d 614, 618 (5th Cir. 1990). If, at any step in the process, the Commissioner determines that the

claimant is or is not disabled, the evaluation ends. *Leggett*, 67 F.3d at 564.

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating physicians on subsidiary questions of fact; (3) subjective evidence of pain and disability as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's education, background, work history and present age. *Wren*, 925 F.2d at 126.

## V. Discussion

### A.      Objective Medical Evidence

The objective medical evidence, which dates back to January 2004, shows that Robinson suffers from multiple sclerosis. She has complained about the symptoms accompanying this disease, and has been treated for these symptoms.

According to the medical records, around January 7, 2004, Robinson made her initial visit to Dr. Newmark's office regarding a possible diagnosis of multiple sclerosis. Dr. Newmark reports that, at this appointment, Robinson presented symptoms that were suggestive of the disease, including fatigue and numbness. (Tr. 62). A previous MRI revealed data that was consistent with a diagnosis of multiple sclerosis, including lesions and sensory differences. (Tr. 195). A lumbar puncture performed on January 14, 2004, revealed an elevated count (7.0); this finding is consistent with a diagnosis of Multiple Sclerosis. (Tr. 158, 195). In addition, the diagnosis of multiple sclerosis was confirmed by an analysis of cerebrospinal fluid. (Tr. 62). While a somatosensory evoked response report conducted on January 28, 2004 revealed that somatosensory evoked response in the upper extremities was normal, the accompanying doctor's visit revealed

changes in sensation to the left side of Robinson's body. Around this time, Robinson was put on Provigil, a medication used to counteract fatigue. (Tr. 153, 195). A series of MRIs dating from July 9, 200? reveal "areas of increased signal" within Robinson's spinal cord, which was consistent with a diagnosis of multiple sclerosis. (Tr. 147) At this point, Dr. Newmark assessed Robinson's Multiple Sclerosis as being "so far mild." (Tr. 50).

Robinson consulted a second doctor, Dr. Reed-White, regarding her symptoms of multiple sclerosis on November 23, 2004. Robinson was concerned about pain in her lower back and right heel, as well as a drop in weight of six pounds. Dr. Reed-White, upon learning that Robinson had not been taking Provigil every day, prescribed Naproxen and "ordered x-rays, laboratory tests and suggested supplemental meals with Boost or Ensure." (Tr. 198). Other than revealing that Robinson returned to Dr. Reed-White for a visit concerning a finger infection that was unrelated to her multiple sclerosis on March 1, 2005, the record is silent in regards to Dr. Reed-White's findings and test results. (Id.).

Robinson returned for another appointment to Dr. Newmark's office on January 6, 2005. Robinson's primary complaint during this appointment was extreme fatigue and paresthesias, as well as a "warm sensation on right pelvic area for a week." (Tr. 196). After seeing that Robinson's symptoms were worsening, Dr. Newmark suggested that Robinson retire from her job on the grounds of disability. He issued a physician's statement on disability on January 6, 2005. The statement cited a neurological exam that revealed hyper reflexes, decrease of RAM in Robinson's left, lowered coordination, lowered reaction times and "fatigue unrelieved by rest periods or stimulants" (Tr. 64). Dr. Newmark assessed that the multiple sclerosis is progressive, and that it would be unlikely that Robinson would ever be able to work a regular full time job again. (Id.).

8

Dr. Newmark elaborated on many of these points in a report filed with the Standard Insurance Company on March 21, 2005. Dr. Newmark commented that Robinson currently ranked in percent in the Karnofsky Performance Status Scale, indicating that while she could care for herself, she couldn't "carry on normal activity or do active work." (Tr. 199). In addition, Dr. Newmark indicated that the expected Robinson's condition to regress, due to the progressive nature of multiple sclerosis. However, Dr. Newmark revealed that he never performed functional capacity testing on Robinson because he lacked appropriate facilities. (Tr. 198).

An April 6, 2005 memorandum by Shauna Sweet, RN for Standard Insurance, revealed that Dr. Dickerman felt that the medical records did not support that Robinson "could be precluded from the physical demands of a light level occupation," though the report acknowledged that multiple sclerosis is an illness that is usually characterized by exacerbations and remissions of symptoms and unpredictable progression. (Tr. 197). The report also stated that additional medications were usually believed to counteract the symptoms of fatigue, though Dr. Newmark only prescribed Provigil for his patients. (Tr. 196). The report suggested that "Current records from a neurologist and new diagnostic reports would be helpful, if available." (Tr. 197).

On May 19, 2005, an interviewer named R. Luna performed a field examination on Robinson. He noted that Robinson did not have apparent difficulties with hearing, reading, breathing, understanding, coherency, concentrating, talking, answering, sitting, standing, walking, seeing, using her hands, or writing, and that "no signs of disabling condition" were spotted, though the attached report included an interview with Robinson where she cited her problems with concentration, exhaustion, keeping pace at work, remembering things, typing (due to numbness in the hands) and vision blurriness. (Tr. 97-99).

9

On May 20, 2005, Robinson received a daily activity questionnaire that inquired into lifestyle, exercise habits, and how the disability affected her daily routine. Robinson left this blank, except for a section in which she claimed that she did not have mental or emotional problems that limited what she was able to do and that she was not currently receiving treatment for such problems. (Tr. 104-109).

Pursuant to her claims of disability with the SSA, Robinson was evaluated by Dr. Joe Anighogu on July 13, 2005. Dr. Anighogu noted that Robinson complained of fatigue, difficulty concentrating with her job, memory problems, problems with directions, and right heel pain (Tr. 169). Dr. Anighogu's record reveals that the right heel pain was "about 10" with 3-4 episodes a week lasting about 8 hours," that "the pain resolves spontaneously," and that "she had an x-ray and was told it was negative." (Id.). He performed a visual acuity test that registered 20/25 (20/200) 20/20 (20/200). (Tr. 170). In his neurological testing, Dr. Anighogu found that "Cranial nerve II-XII grossly intact," that "Strength 5-/5," that "sensation intact to pinprick and light touch," that "cerebellar examination was intact," and that "no cognitive defects noted." (Id.). Finally, Dr. Anighogu noted that Robinson was independent in her ability to care for herself and could walk and stand with good balance and no abnormality. (Id.).

At a routine doctor's visit for a case of the flu on November 8, 2005 revealed that Robinson complained of stiffness and having difficulties lifting her left arm above a horizontal degree for the last two months. It also noted that Robinson was tripping over her feet when walking, having extreme fatigue and becoming depressed for being unable to do the things that she wished to do. She also reported having numbness, particularly in the fingertips. (Tr. 21).

Here, upon the totality of the record, the objective medical evidence weighs in favor of ALJ's conclusion that Robinson's multiple sclerosis did not meet or medically equal one of the impairments in 20 CFR Part 404, Subpart P, Appendix 1. Virtually all of the evidence supports Robinson's diagnosis with multiple sclerosis. However, virtually none of the objective medical evidence reveals an equivalence to the listed conditions in 20 CFR Part 404, Subpart P, App 1. The required conditions of "significant and persistent disorganization of motor function in extremities resulting in sustained disturbance of gross and dexterous movements, or gait station" is not demonstrated in the objective medical records. 20 C.F.R. art 404, Subpt. P, 1, Listing 1.09. In addition, little of the objective evidence suggests that Robinson suffers from "visual or mental impairment." Id. The requirement of "significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity" is not supported in the objective medical record, which suggests that Robinson has near-normal muscle strength. Id.

As it stands, the objective medical evidence reveals little in regard to the symptoms that Robinson complains of. Therefore, this factor weighs in favor of the ALJ's decision.

### B.   Diagnosis and Expert Opinions

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact. Unless good cause is shown to the contrary, "the opinion, diagnosis and medical evidence of the treating physician, especially when the consultation has been over a considerable length of time, should be accorded considerable weight" *Perez v. Schweiker*, 653 F.2d 997, 1001 (5th Cir 1981); *see also Newton v. pf l*, 209 F.3d 44 5

11

(5th Cir. 2000) ("The opinion of the treating physician who is familiar with the claimant's impairment, treatments and responses should be accorded great weight in determining disability"). In addition, a specialist's opinion is generally to be accorded more weight than a non-specialist's opinion. *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994); *Moore v. Sullivan*, 919 F.2d 901 (5th Cir. 1990). For the ALJ to give deference to a medical opinion, however, the opinion must more than conclusory and must be supported by clinical and laboratory findings. *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981). Further, regardless of the opinions and diagnoses and medical sources, "'the ALJ has sole responsibility for determining a claimant's disability status.'" *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995) (quoting *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)).

The Social Security's Regulations provide a framework for the consideration of medical opinions. Under 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6), consideration of a physician's opinion must be based on:

    (1)    the physician's length of treatment of the claimant,

    (2)    the physician's frequency of examination,

    (3)    the nature and extent of the treatment relationship,

    (4)    the support of the physician's opinion afforded by the medical evidence of record,

    (5)    the consistency of the opinion with the record as a whole, and

    (6)    the specialization of the treating physician.

*Newton*, 209 F.3d at 456. While opinions of treating physicians need not be accorded controlling weight on the issue of disability, in most cases such opinions must at least be given considerable

deference. ". As to opinions of examining physicians, the Commissioner ves more weight

opinions of source who has examined the plaintiff rather than the opinion of a source who has

performed such an examination. *See* 20 C.F.R. 404.1527(d)(1), 416.927 )(1 . Finally, as to

opinions of physicians who have reviewed the medical record, such as state agency physician

opinion is evaluated according to the above framework, and the ALJ must explain in his deci

the weight given those opinions. *See* 20 C.F.R. § 404.1527(f)(2)(ii) & (iii). 16. 927(f)(2)(ii) &

An "ALJ i free to reject the opinion of any physician when the evidence supports a con

conclusion" *Newton*, 209 F.3d at 455 (quoting *Brown v. Apfel*, 192 F.3d 2, 00 (5th Cir. 19 9

"The ALJ decision must stand or fall with the reasons set forth in the AI 's ecision, as ad

by the Appeals Council." *Id.* At 455; *see also Cole v. Barnhart*, 288 F.3d 49, 151 (5th Cir.

("It is well established that we may only affirm the Commissioner's decision the grounds

he stated for doing so."). However, perfection in administrative proceedings is not required

*Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 988).

Dr. Newmark revealed his opinion in a medical questionnaire the ALJ regarding

symptoms of Robinson's multiple sclerosis. (Tr. 179). Dr. Newmark confirmed that Robi

indeed had multiple sclerosis, as confirmed by MRI, CSF, and clinical observations. He listed

of Robinson's symptoms, including fatigue, balance problems, poor ordination, weak

unstable walking, numbness, difficulty remembering, and depression. ( r. 180). Dr. New

confirmed that Robinson was not a malingerer. (Tr. 181). While Dr. ewmark admitted

Robinson did not have "significant and persistent disorganization of motor function i

extremities resulting in sustained disturbance of gross and dexterous movement or gait and sta

he did indicate that Robinson suffered from fatigue that could occur with ss than two hours

13

of minimal exertion. (Id.). Dr. Newmark noted that this disease could w    and wane in sev
(Tr. 182). Emotional factors were not determined to contribute to the severity of Robin
symptoms. (Id.). All of the listed impairments were noted as reasonally consistent wit
diagnosis, with fatigue being the most disabling symptom. (Id.). He deen d the symptoms s
enough to frequently interfere with Robinson's concentration to a moderate degree, and
impairmen   were deemed expected to last for the rest of Robinson's li   (Id.). Robinso
deemed, as of January 6, 2005, to only be able to walk less than 1 bloc before tiring, and
required in ermittent assistance of a cane to walk. (Tr. 182-83). The impairments were no
likely to pr duce "good days" and "bad days," with Robinson likely to miss work about three i
every mon  . (Tr. 184). However, Dr. Newmark declined to answer y questions rela
functional apacity testing, noting that he did not have the facilities to m e such measurer
(Tr. 183).

Dr. James A. Wright formed a very different opinion regarding e status of Robin
illness. On July 14, 2005, he completed a physical residual functional cap ity assessment fro
review of Robinson's medical records. From that review, Dr. Wright op ed that Robinson
occasional lift up to 20 pounds, frequently lift 10 pounds, stand and wal for a total of at lea
out of eigh hours in a normal workday, sit for t least six out of eight ho s in a normal wo k
and perfor  an unlimited amount of pushing and pulling. (Tr. 172). H also deemed Rob i
unable to imb ladders, rope, or scaffolds (Tr. 173). The report indicat d that Robinson ha
visual limi ations established and that her visio n "corrects to 20/20 and 20/25." (Tr. 174
manipulat e, communicative, or environmental limitations were noted. (Tr. 174-75). The
concluded hat the conclusions of the treating physician (Dr. Newmark) were different fro e

14

reports of the functional capacity test. The report noted that, though Dr. Newmark claimed

fatigue and numbness were Robinson's primary symptoms, the "current CE does not su[...]

numbness" and that, although the claimant reported fatigue, "strength is 5-/[...] and the claimant [...]

walk without abnormalities for the examination. In addition, "no cognitive deficits" were no [...]

the CE. (T 177).

At the hearing, Dr. Oguejiofor, a medical expert, also presented an opinion contrary [...]

opinion of Dr. Newmark. Dr. Oguejiofor formed his opinion after reading [...] nson's record

228). He did not feel that any of Robinson's symptoms equaled a condition found in Listing 1

(Tr. 229). He also felt that Robinson's multiple sclerosis symptoms did not preclude her from [...]

work schedule:

Q: Right. And is fatigue a normal symptom of Multiple Sclerosi

A: Well, Your Honor, the way that I look at it is especially looking at the Listing as
we if we're talking about fatigue, you're talking basically as, even that there's
muscle weakness.

Q: Um-hum.

A: What is really what will give you fatigue.

Q: Okay.

A: So, again her exam have not the most treated, you know, muscle fatigue.

Q: Okay.

A: At least as of, as of the last time she was seen in July of 2005, her muscle strength
was 5 over 5 in all extremities. So, aside from fatigue that you have from muscle
weakness, any other fatigue that she's talking about are, you know, I'm not really
sure how I'm going to be able to classify that, Your Honor.

Q: Okay. So, based on your review of the record, Dr. Oguejiofor, would you —
would you place any restrictions upon Mrs. Robinson's ability to perform work-

rela d activity?

A:    our Honor, I believe that she can f nction at the light le el.

Q:    ull range?

A:    es, Your Honor.  (Tr. 231-32).

The ALJ rejected the opinion of Dr. New mark on the basis of con    c   with the opinic

Dr. Ogueji  or and Dr. Wright. The ALJ began l y correctly discounting th  ss rtion that Rob

could clair  benefits through the symptoms in  isting 11.09 of having "  or anization of

function in  extremitie ," "visual impairments v hich do not correct," or "m  ta impairments.

21-22).  H wever, the ALJ proceeded to erro eously discount Dr. New  arl 's testimony

considerin  if Robinson's symptoms equaled  ie third listed symp om    L  ting 11.09, t

"Significat , reproducible fatigue of motor func ion with substantial nusc  we akness on rep t

activity, d monstrated on physical examination." 20 C.F.R. Part 404, S  op  P, App. 1, L

11.09. Th  ALJ erroneously cited conflicts wi h the pre-hearing examin g medical expert

wrote:

Th  igh the cla mant complains of fatig e, the medical evidence in  he ile does not
sho  significant, reproducible fatigue  f motor function with s  sta tial muscle
we ness, demonstrated on physical  xamination – despi e th  an wer by Dr.
Ne mark that she does (Exh. 4F-3). I r. Anighogu ha  reported  ie claimant has
dec ased muscle strength, to 5-/5 (E h. 2F-2). Dr. Newmark  epo rs that the
cla ant's stre gth has decreased to 4/5  n her left upper extre ity,  it  ports all her
oth   extremitie s show at 5/5 (Exh. 5F- , 3, November 8, 2006).

Th  key absence, or missing evidence,  s the reproducible fa igue  em onstrated on
ph ical examination. The medical evi ence in the file does not s  ow  ny physical
exa nination in which the claimant's fa igue was demonstral ed.   e  is no report
of  ty examination in which the claiman 's muscle strength or weal  ess was actually
tes  d. Dr. Newmark specifically decli ed to answer as to the clai  an  s functional
cap city, replying that he had no faciliti s for functional capac ty te  ing (Exh. 4F-5).
Th  absence of direct evidence demonst ible and demonstrated mu  le  eakness and

fati...le shows D...Newmark's statement...n this question cannot be...rrect. (Tr. 22).

From here, ...e ALJ re...ed on the testimony of I...r. Oguejiofor, as support...by the opinion of Dr. W...t, to support his conclusion that R...inson was not disabled:

> In m...king this finding, I considered the evidence in accordance with...e requirements of ...CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 00-3p. The claimant's resi...ual functional capacity was evaluated for the state agency by...ne...A. Wright, M.D...., a medical expert, fully familiar with evaluation of residual functional capacity for...ocial Security disability purposes. I...r. Wright evaluated the cl...mant as having the...esidual functional capacity for the exertional demands of light work, with the one...ostural limitation precluding climbing ropes, ladders or scaffo...s--precisely the residual functional capacity stated above. I credit Dr. Wright, a...d, based on his eva...ation, I assign the claimant the same residual functional capacity as he described.

> Dr...)guejiofor also testified as to his opinion of the claimant's residual functional capacity: that the claimant could perform the full range of light work. I agree generally with Dr. Oguejiofor, but include the postural limitation introduced by Dr. Wr...ht. No doctor who has examined or evaluated the claimant ha...made a medical statement as to the claimant's residual functional capacity, or that s...is disabled and cannot work.

> Dr...Newmark, her treating physician, however, has made just such statements as to the...laimant being disabled. He has stated, and directly, that the cla...ant is disabled based on a standard which is very like, or includes, that for Social Security disability, as comparison to 20 CFR 404.1505 shows. (Exh. 1F-3). Another statement by Dr. Newmark, produced by the claimant h...rself after hearing, is to...e same or very similar effect – that the claimant should stop work, as of January 200...and cannot anticipate returning to work (Exh. 7B-12). These opinions as to disability are, of course, on issues reserved to the Commissioner, 20 CFR 404 1527(e). I note again that Dr. Newmark has specifically refrained from giving an opinion on the claimant's residual functional capacity, once by writing that he has no facilities for functional capacity testing (Exh. 4F-5; see also Exh. 7F-14, 15) and again by failing to reply to my request for such an opinion (See Exh. 8B).

> Dr...Newmark's opinions, as he is the claimant's treating physician for her multiple sclerosis, are given significant weight, per 20 CFR 404.1527, but I do not credit his opinions as establishing the claimant's disability, because I c...not find them supported by the medical evidence. I consider Dr. Newma...'s opinions as generalized statements as to the medical severity, likely course a...likely eventual result of multiple sclerosis, with application generally to all p...sons who have

multiple sclerosis – but not tied specifically to the claimant and her actual condition during the times relevant to this proceeding. Dr. Newmark's statements are, to paraphrase Mr. Justice Holmes, general principles which do not decide this particular case. The medical evidence in file, and specifically Dr. Newmark's notes of his appointments with the claimant, do not show observable signs or laboratory test results showing the claimant disabled or so functionally limited now as to be disabled. Nerve tests for somato-sensory responses made in January 2004 were normal in places tested (Exh. 1F-12); and Dr. Newmark never reports any adverse change to this (See e.g. Exh. 7F-2, 3). Dr. Newmark never refers the claimant for a test of her fatigue, even for an exercise test of the type familiar from a cardiovascular testing, and he never refers her for any kinesiology examination. And, of course, he never has her functional capacity actually tested, nor does he refer her for a physical therapy evaluation.

Dr. Newmark expressly relies on claimant's fatigue as the basis for her being, in his opinion, disabled (Exh. 5F-3). Dr. Newmark refers to only 2 other symptoms, in addition to her fatigue, as affecting the claimant's ability to work or perform her activities of daily life: parasthesias and pain (Exh. 5F-14). But the notes from an examination in November 2006 show the claimant's vibration sensation intact, with no mention of any other sensory deficit (Exh. 5F-2). I see no report of Dr. Newmark finding any paresthesia on any examination of the claimant. And though those same notes describe the claimant as having pain in her left arm or shoulder, and she had her shoulder x-rayed based on reports of pain (See Exh. 5F-6), at hearing the claimant did not testify to shoulder pain or having pain at all. The contemporaneously made medical evidence does not support Dr. Newmark's later stated opinion.

Eliminating these 2 other symptoms leaves the claimant's reported fatigue only. And the claimant testified accordingly, that her major problem from her multiple sclerosis is her fatigue, and its effects – limited activity during the day including inability to concentrate and remember, napping during the day and difficulty sleeping at night. And a claimant's reports of symptoms to her doctor are just that – her reports, to be evaluated as are any other reports of symptoms, under Social Security regulations and rulings.

I also considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSRs 96-4p and 96-7p.

Evaluation of symptoms is a 2 part process. First, does the claimant have a medically determinable impairment reasonably likely to cause the complained symptoms? And, second, does the medical evidence, and the other evidence, support the claimant's reports of symptoms. Evaluation of symptoms raises the question of the intensity, persistence and effects of a claimant's symptoms. And evaluation of symptoms

rais the questions of the claimant's credibility.

The claimant has a medically determinable impairment reasonably likely to cause fatigue at some level: her multiple sclerosis. Dr. Newmark's evidence, with which there is no disagreement, is that fatigue is a major early symptom of multiple sclerosis, which can cause poor reaction times, decreased cognitive abilities and decreased concentration (Exh. 1F-3).

But the medical evidence does not support the claimant's reports of fatigue at the level she reports. As Dr. Oguejiofor noted, the medical evidence available at the hearing did not show muscle weakness having been observed on any examination. Even the later produced medical evidence does not show muscle weakness of any great extent. As already noted, at the consultative examination Dr. Anighogu reported the claimant has decreased muscle strength, to 5-/5 (Exh. 2F-2). In November 2006, Dr. Newmark reports that the claimant's strength was decreased to 4/5 in her upper extremity, but reports all her other extremities show 5/5 (Exh. 5F-2, 2. I consider these deficits not significant, and note the increase in strength in three of the claimant's extremities.

When asked to report her daily activities, the claimant left the questionnaire blank save for signing and dating it (Exh. 3E). Her testimony as to daily activities is that she does not do much – she wakes early, sends her children to school, seeing to their dressing and grooming and eating breakfast; empties the dishwasher, and does the cleaning and the laundry, so she doesn't get overwhelmed; may do an hour or two out of the house, and does the grocery shopping herself; naps for an hour or two, and if she does not, she is exhausted the next day; helps her children with homework, and sees they bathe and get put to bed in the evening; and has difficulty eating at night. She reports that if she gets off schedule she gets frustrated, and her day becomes a mess. She reads magazines and watches television, but has difficulty keeping up. She does not exercise, but reports having lost 40 lbs. in the last 2 years she seldom goes to school events. She describes her days and weeks as being pretty much the same, with one week per month pretty bad, when getting up is hard. None of this, of course, is reflected in the medical records, and she does not report being a counselor or support or mutual help group. (Tr. 21-24).

In rejecting Dr. Newmark's medical opinion, the ALJ heavily relied on the assumption that fatigue is the same symptom as muscle weakness, and that the tests reveal no substantial muscle weakness on the part of Robinson. However, Dr. Oguejiofor admitted at the hearing that mental fatigue and physical fatigue can be two separate symptoms:

Q. Dr. Oguejiofor, is it correct to understand you to say that she that you're not able to categorize or to quantify the, the mental fatigue – is the physical fatigue that you're quantifying?

A. Yes.

Q. So, the mental fatigue could still, could still be there that she's, that she describe in her testimony, is that correct?

A. Yes, it's possible, yeah. (Tr. 232).

If muscle weakness and fatigue are not the same thing, then there is no conflict between the findings of Dr. Newmark and the medical evidence of the record at all. As quoted above, the ALJ cited muscle weakness tests to support his conclusions; however, these muscle weakness tests would do little to reveal mental fatigue. Dr. Oguejiofor's comments regarding mental fatigue make sense of some of Robinson's greatest difficulties, such as having to nap for 1-2 hours every day to avoid extreme exhaustion, having problems keeping up with the pace at work, and having to miss work as many as three days a month due to having bad days, would not be expected to show up on a muscle weakness test. (Tr. 184, 220, 223). Because the ALJ equated fatigue with muscle weakness without any basis in the record for doing so, the ALJ's rejection of Dr. Newmark's opinion is unsupported.

In discarding Dr. Newmark's opinion, the ALJ also failed to consider other factors listed in the regulations for weighing expert opinion. When assigning the weight that the opinion of a treating physician is given, the ALJ must consider the length, frequency and extent of the physician's treatment, as well as the specialization of the physician. See 20 C.F.R. § 404.1527(d) (6), 416.927(d)(2)-(6). The ALJ failed to consider the fact that Dr. Newmark had treated Robinson for multiple sclerosis since the onset of the illness in January 2004, that Dr. Newmark is a certified

MD who specializes in neurology and has over 20 years of experience, the Dr. Newmark was

primary (and almost exclusive) physician that Robinson consulted regarding her illness, and

Robinson saw Dr. Newmark periodically throughout 2004 and 2005. (Tr. 18 -84). Consequently

Dr. Newmark would be expected to have more insights into the illness of the patient than

Anighogu, Dr. Wright, or Dr. Oguejiofor, none of whom had any sort of long-term contact

Robinson. Tr. 169, 171, 228). Dr. Newmark's opinion deserved considerable deference, and

ALJ erred in not giving it.

The ALJ erred in his assessment of Dr. Newmark's opinion by focusing on a conflict in

evidence that did not exist. As a result, the ALJ improperly rejected deference to Dr. Newmark's

opinion. Given that improper rejection, this factor weighs against the ALJ's decision.


### C.   Subjective Evidence of Pain and Disability

The third element considered is the subjective evidence of pain and disability, including

claimant's testimony and corroboration by family and friends. Not all pain and subjective symptoms

are disabling, and the fact that a claimant cannot work without some pain or discomfort will

render him disabled. *Cook*, 750 F.2d at 395. In an appeal of a denial of benefits, the Act requires

this Court's findings to be deferential. The evaluation of evidence concerning subjective symptoms

is particularly within the province of the ALJ, who has the opportunity to observe the claimant.

*Hames v. Heckler*, 707 F.2d 162, 166 (5th Cir. 1983).

Credibility determinations, such as that made by the ALJ in this case in connection

Wilkins' subjective complaints, are generally within the province of the ALJ to make. *See*

*Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994) ("In sum, the ALJ is entitled to determine

the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly (quoting *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985)), *cert. denied* 513 U.S. 1120 (1995).

In this case, there is plentiful subjective evidence of pain and disability. Dr. Newman reported that Robinson was suffering from fatigue and numbness from the time of their first visit in January 2004; he later commented that, though he prescribed Provigil to counteract the fatigue, fatigue was unrelieved by rest periods or stimulants. (Tr. 142-43, 149). Later, Dr. Newman confirmed that this fatigue causes loss in concentration, poor reaction time, and lowered cognitive abilities. (Tr. 144). By 2005, Dr. Newmark's nurse, Susan Reed, noted that Robinson was "Having more and more fatigue. By middle of day symptoms worsening. Lots of pain, lots of paresthesias. Becoming depressed." (Tr. 196).

Robinson revealed more about the level of fatigue that she was experiencing through her office disability report, conducted on May 19, 2005:

> I'm fatigued and exhausted all the time, can't keep up the pace needed at work, and my memory's been affected. Numbness in my left hand keeps me from typing, other things involving use of hands. Vision, sometimes a temporary blurriness occurs. (Tr. 99).

In addition, during her appointment with Dr. Anighogu on July 8, 2005, Robinson revealed additional information regarding the level of disability of her symptoms.

> She states since then she gets extremely fatigued and very tired all the time. She was having extreme difficulty completing her tasks or meeting deadlines (in) her job resulting in her giving up her job. She also has been having poor memory. She is not sure if her is her memory problem is no remote or recent even but probably a combination. She has most difficulty with directions, she got lost going to her father in-laws house, which she has done several times in the past. (Tr. 59).

Dr. Newmark submitted a new, more detailed report on Robinson's symptoms in preparation for the hearing before the ALJ. He revealed that Robinson suffered from multitude of subjective

symptoms, including fatigue, weakness, and difficulty remembering. (Tr. 18). He also recorded

that the fatigue could occur with minimal exertion, even "less than two hours." (Tr. 181)

Newmark also recorded that while these symptoms wax and wane in severity, they are frequently

severe enough to interfere with attention and concentration and result in moderate limitation in

Robinson's ability to deal with work stress. Tr. 182). While Dr. Newmark did not have the

facilities needed for a residual functional capacity test (which may have shed some further light

Robinson' disability), he noted that the patient' impairments could lead to good and bad days and

they were likely to result in Robinson being absent from work three time a month. (Tr. 184)

Robinson testified as follows regarding subjective symptoms in hearing before the ALJ:

Q.   Now tell me what's going on with your MS.

A.   My primary symptom is fatigue.

Q.   Okay. And do you experience the fatigue on a daily basis or-

A.   Yes. (Tr. 211-12).

To cope with this fatigue, Robinson revealed that she naps daily for 1-2 hours. (Tr. 2

She also revealed that the symptoms are worse ung with time. (Tr. 214) Robinson repeated th

these symptoms had been taking a toll on her career.

Q.   Okay. And what kind of problems were you having when you were working as
a Probation Officer, what type of problems were you having there towards the
end that caused you to retire?

A.   Toward the end, I was not meeting deadlines. I was not completing training
hours. I was forgetting to sign in and out. I began the – to get written up and I, I've
never been written up before. It was a job I thought I could do --

Q.   Um-hum.

A.   - with ease and it has got to a point in fact, in '03, I started to get, got my first

23

corrective action. That was before I was diagnosed.

Q.    h, okay.

A.    nd I knew I was having trouble and I didn't know why I was having trouble.

Q.    m-hum.

A.    I was having trouble meeting dead nes, completing my training hours with the not following Court policies, and the –

Q.    That kind of problems have you had with your concentration or your memory?

A.    it's almost the same as work. I would just forget. I'm forgetful and there's like I said there's a couple of cases where I, you know I'm driving, I kind of have a loss where I am.

Q.    m-hum.

A.    And that's happened a, like I said, a couple of occasions.   You said concentrating?

Q.    r you –

A.    You know, just being generally tired.

Q.    Okay. Are you – during the day, do you spend part of the time watching TV or reading magazines, reading books, anything like that?

A.    Yes, Sir.

Q.    Do you have any difficulty keeping up with what's going on, and the TV shows or the news that you're watching or, or reading the book, keeping up with the, the story line, anything like that?

A.    find that's – I used to do a lot of reading, but I can't do that right now. What I do I – to kind of do my reading, I'd read magazines so I know the short articles I'm going to be finished in a, you know, reasonable period of time.

Q.    Do you find yourself ever having to go back and re-read chapters because you lost your place and or lost what was going on?

A.    Yes. (Tr. 214-16).

Robinson also revealed that her exhaustion got in the way of doing routine household chores.

Q.   Now you indicated you are able to do the dishes and, and show what about the laundry, vacuuming, sweeping, mopping, things like that?

A.   I try to do just a little every day, you know, so I won't be really inundated with it, you know.

Q.   Um-hum.

A.   No, I just do maybe a load.

Q.   Okay.

A.   And let that be it and –

Q.   Same thing with the house clean, keeping it clean?

A.   Yeah. I just, the only thing I do is to try to keep things from being overwhelming. (Tr 218).

Robinson also testified that her napping was compulsory and limiting.

Q.   Okay, and are you – have you ever gone without a day or been able to go a day without having to take a nap?

A.   No.

Q.   And generally, how long do you nap for during the day?

A.   It's probably an hour.

Q.   That one nap?

A.   Um-hum. I have to nap every day. If I don't it's, it's another day of trying to get over not taking a nap on the day before

Q.   Okay let's say you, you skip a day without a nap. What kind of problems do you have, that night or the next day?

A.   The next day I'm just exhausted.

Q.   Okay.

A.   nd any time I just don't take a nap s, it's, it's a day lost.

Q.   What about your mental comprehension or your attitude?

A.   guess I feel more frustrated or, you know, because I can't fo us or do what I
nee  to do and I feel like I'm just really off – I don't know, my sch dule or just I'm
– m  day is just going to be, and it will e a mess.

Q.   kay. Are some days or weeks better than others? Or do you ave more – you
see  to have more energy for a short period of time, or is it pretty much just pretty
stea y across the, the board?

A.   's pretty, it stays pretty much the same, but you know, it s lik  a one week per
mo   h, it's just bad. It's just not, it's, it s, hard to even get up. (T  22)-21).

Ro  nson left her "daily activity questionnaire" blank. (Tr. 104).   ov ever, her testi

and the res  of the record reveals most of the information that she failed to provide in the d

activity que tionnaire.

The ALJ concluded that the subjective evidence on the part of Rob son was suspect o

basis that i  was unsupported by the medical record:

> Bu   he medical evidence does not supp ort the claimant's reports f fatigue at the
> lev   she repor s. As Dr. Oguejiofor n ted, the medical evidenc  iva lable at the
> hea  ng did not show muscle weakness having been observed on y  xamination.
> Ev  t the later produced medical evider  ce does not show muscle  real ness of any
> gre  t extent.  As already noted, at the consultative examinatio  D . Anighogu
> rep  rted the claimant has decreased i uscle strength, to 4-/5  xh  2F-2).   In
> No  ember 2006, Dr. Newmark reports t nat the claimant's strength  as decreased to
> 4/5  n her left upper extremity, but repor s all her other extremities  ov  at 5/5 (Exh.
> 5F  , 3). I consider these deficits not s gnificant, and note the in  eas  in strength
> in  ree of the claimant's extremities. ( Tr. 24).

As a result  f this conflict, the ALJ dismissed th  subjective evidence of pa  n and disability as b  g

"not entire y credible." (Tr. 25).

The ALJ erred in discarding this evidence. The ALJ, again, assume  that mental fatig  d

muscle we kness are the same symptoms, an  therefore any mental fa  gue that Robinso  s

26

experiencing would show up on a muscle strength test. However, his own experts disagreed with this assertion.

> Q. r. Oguejiofor, is it correct to understand you to say that the, the you're not able to categorize or to quantify the, the mental fatigue – it's the physical fatigue that you re quantifying?
>
> A. es.
>
> Q. o, the mental fatigue could still, could still be there that she's, ut she describes in her testimony, is that correct?
>
> A. es, it's possible, yeah. (Tr. 232).

According to Dr. Oguejiofor, the mental fatigue that is at the heart of Robinson's disability would not show up on any of the muscle strength tests or any of the objective medical evidence that obtained.

Because the ALJ improperly equated muscle weakness with fatigue in rejecting Robin s testimony as to her subjective symptoms (particularly her fatigue), the subjective evidence facto weighs against the ALJ's decision.

## D.   Education, Work History and Age

The fourth element considered is the claimant's educational background, work history present age. A claimant will be determined to be disabled only if the claiman's physical or r impairments are of such severity that he is not only unable to do his previous work, but c considering his age, education and work experience, engage in any other kind of substantial ga work which exists in the national economy. 42 U.S.C. § 423(d)(2)(a).

The record shows that Robinson, at the time of the hearing, was for four years old and had a college degree. (Tr. 220). She performed the duties of a probation officer sixteen years before retiring due to multiple sclerosis. (Tr. 223). The ALJ questioned Charles R. Poor, a vocational expert ("VE"), at the hearing about Robinson's ability to do her past work and her ability to engage in other gainful work activities. "A vocational expert is called to testify because of his familiarity with job requirements and working conditions. The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) (quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)). It is well settled that a vocational expert's testimony, based on a properly based hypothetical question, constitutes substantial evidence. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994). A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record. Beyond the hypothetical question posed by the ALJ, the ALJ must give the claimant "the opportunity to correct deficiencies in the ALJ's... hypothetical questions (including additional disabilities recognized by the ALJ's findings and disabilities recognized but omitted from the question)." Here, both the ALJ and Robinson's attorney had the opportunity to question the vocational expert. Robinson's attorney had no questions for the expert. The record shows that the ALJ posed the following questions to the vocational expert:

Q. I'll give you a couple of hypotheticals. Mr. Poor, assuming if you were an individual the same age, education, and work experience as Ms. Robinson who can lift 10 pounds frequently and 20 pounds occasionally, stand and walk for 6 hours and sit for 6 hours or is to never work around ropes, ladders and scaffolds. Could such a person perform the past work as Ms. Robinson?

28

A.     my opinion, the person described herein the hypothetical cou    d the work of
a Probation Officer.

Q.     such a person again, the same age, education and work experience as Ms.
Robinson were restricted to lifting less than 10 pounds frequent   but up to 10
pounds occasionally, standing and walking for 6 hours, but sitting     6 hours, again
never working around ropes, ladders or scaffolds. Could such a person still do the
past work of a probation officer?

A.     They couldn't do the job as officially described in the DOT.    y personal and
professional opinion is that probably at least a third of the jobs ca   ring the title of
Probation Officer or Parole, Parole Officer would be consi    ent with your
hypothetical but not all of them.

Q.     Okay. Can you identify 3 other jobs such a person could perform within the
residual functional capacity?

A.     think the person described in that hypothetical could perfo    the following
representative jobs. They could work as a cashier, an information    erk, a telephone
survey clerk. (Tr. 233-34).

To     come up with the physical requirements that would be needed    to perform Robin's

work as a probation officer, the ALJ used the findings from the record after    hoosing to discount

opinion of Dr. Newmark and the subjective evidence submitted by Robin    n. As a result, the     f

determined that Robinson, "with the residual functional capacity I have ass    gned her, could pe

her past relevant work as a probation officer" or "approximately one-third of the probation of    r

jobs as generally performed and described in the Dictionary of Occupational Titles." (Tr. 2

However, the record reveals that the vocational expert would have changed his op    i    n

considerably had the opinion of Dr. Newmark and the subjective medical evidence from Rob    n

been factored in:

Q.     Going back to the first hypothetical Mr. Poor, if you add to that    that a person can
on     , that due to fatigue, a person can only attend and concentrate    for two-thirds of
a working day, can such a person perform the past relevant work    M . Robinson?

A.   , my opinion, no, Sir.

Q.   there any other work such a perso could perform?

A.   o, not at a competitive level, no, Si .

Q.   .nd then going back to the first hypothetical again, add to t  t t at a person
bec  ise of fatigue would need to rest for  hour each day in addition  o tl e usual and
cus  mary breaks. Again can such a pers n perform the past work  Ms Robinson?

A.   1 my opinion, No, Sir.

Q.   ; there any other work such a perso  can perform?

A.   lo, that's not a profile of a competi ve worker.

Q.   Okay. Thank you, Mr. Poor. (Tr. 235).

Be  use the ALJ improperly rejected  he opinions of Dr. New  irs and the subj  t  :

evidence a  presented by Robinson, the ALJ's esidual functional capac  ' as sessment is fl  .

Given thes  flaws, rem and is warranted.


## VI. Conc  sion and Order

Ba  d on the foregoing, and the conclus n that the ALJ erred in h  reje ction of the tr  ?

physicians  opinions and in his rejection of the cl imant's subjective sympt  1s, substantial evi l  e

does not s  pport the ALJ's decision. Accord ngly, it is ORDERED th  P aintiff's Moti  r

Summ ary  dgment (Document No. 16) is GRA NTED, that Defendar t's c  ss Motion for Sun u  y

Judgment  Document No. 15) is DENIED, an l this case is REMANDI  to the Social Sc :  y

Administr  ion pursuant to Sentence 4 of 42 U.S .C. § 405(g), for further pr  ee ings consiste t  h

this Recor  nendation.

30

Signed at Houston, Texas, this 24th day of July, 2009.

FRANCES H. STACY

UNITED STATES MAGISTRATE JUDGE